<u>**NOT FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:

FSJ Imports, LLC and FSJ, LLC,

                      Debtor.

CHAPTER 11

CASE NO.: 12-22402 and
12-22403 (NLW)
(Jointly Administered)

**OPINION**

```
FILED
JAMES J. WALDRON, CLERK

July 23, 2012
U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY: /s/ Nelson Dos Santos,
         Deputy
```

**Before:**    **HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Richard D. Trenk, Esq.
Joao F. Magalhaes, Esq.
Trenk, DiPasquale, Della Fera & Sodono, PC
347 Mount Pleasant Avenue, Suite 300
West Orange, NJ 07052
Counsel to Debtors and Debtors-in-Possession

Michael D. Sirota, Esq.
Ryan T. Jareck, Esq.
Cole, Schotz, Meisel, Forman & Leonard, PA
25 Main Street
PO Box 800
Hackensack, NJ 07602
Counsel to Joseph Lehey

The matter before the court is a motion to dismiss two Chapter 11 cases primarily on the basis that the cases constitute cases that were filed in bad faith. The court agrees with the movant and dismisses both cases.

## JURISDICTION

The court has jurisdiction to decide this matter pursuant to 11 U.S.C. §§ 1334 and 157, and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). The following constitutes the court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

## STATEMENT OF FACTS

On May 11, 2012 FSJ Imports, LLC ("Imports") and FSJ, LLC ("FSJ") (Collectively, "Debtors") filed petitions for relief under Chapter 11 of the Bankruptcy Code. The debtors have continued in possession of their property and management of their affairs since filing their petitions for relief. An Unsecured Creditors' Committee was formed by the United States Trustee on June 5, 2012, and its counsel has participated in the motion that is the subject of this opinion.

### A.    Pre-bankruptcy history

According to Matt Sandy ("Sandy"), FSJ was formed for the "sole purpose of commercializing and exploiting the concept of a wireless 'billboard on a bottle' by creating a new and original vodka brand." (May 11, 2012 Certification of Matt Sandy ("Sandy Cert." ¶¶ 1,

2

3)) FSJ owns (i) the brand name MEDEA, (ii) the exclusive worldwide marketing and distribution rights for the vodka, and (iii) the exclusive marketing and distribution rights to sell MEDEA vodka using the billboard on the vodka package and vodka bottle design. (*Id.*, ¶ 3) Imports was formed as an agent of FSJ for the purpose of importing and distributing MEDEA vodka. (*Id.*, ¶ 4) Sandy is the sole member of Imports.

The technology and concept of a billboard on a vodka bottle was conceived by Tim Goldburt ("Goldburt") the father of Sandy. (*Id.*, ¶ 11) Sandy and Goldburt sought investors to finance the work necessary to bring the concept to the marketplace, and in Spring 2007 they were introduced to Joseph Lehey ("Lehey") by David Perillo ("Perillo"). (*Id.*, ¶ 12) In June 2007 Lehey entered into a subscription agreement under which he agreed to make a capital contribution of $10,000,000, for which he would receive a 10% membership in FSJ. (Sandy Cert., Exs. C, D)

An Operating Agreement for FSJ was also prepared and executed in June 2007 by Lehey, Perillo, Sandy, Goldburt as Manager for RAM Phosphorix LLC, Francis Massie and AMJG, LLC by Matthew Genua. (Sandy Cert., Ex. E) Under the FSJ Operating Agreement Perillo[1] and Goldburt were designated as the managing members and were given exclusive management authority. (*Id.*, Sec. II (2)) Members were entitled to vote only on sale or merger of FSJ, admission of new members and closing FSJ. (*Id.*, Sec. II(4)) The Operating Agreement further provided that "any Manager may be removed by a vote of all of the other Members of the Company (i.e., exclusive of the Member-Managers) only for reasons of theft, fraud or forgery relating to the Company…." (*Id.*, Sec. II(2))

At the time of execution of the Operating Agreement the percentage allocation of membership interests was as follows: Massie 27%, Perillo 27%, RAM Phosphorix 27%, Lehey

---

[1] Perillo resigned as managing member on September 29, 2010.

3

10%, Sandy 4%, AMJG, LLC 2% and 3% was reserved for incentive compensation. (*Id*., Ex. A) The Operating Agreement also required Lehey's consent for any sale or merger of or acquisition by FSJ and for any expenditure by FSJ that exceeded $50,000. (*Id*., Sec. II(4))

Thereafter, Lehey invested $7.5 million of his proposed $10 million dollar investment. It appears that in or about late 2008 he made no further payments and also began making inquiry into the use of the funds already invested. Ultimately, in September 2010 Lehey commenced suit against Goldburt, Sandy, Imports and others in the Supreme Court of the State of New York ("New York Litigation"). According to Lehey's Second Amended Complaint in the New York Litigation in November 2010, Perillo, Massie and AMJG assigned their membership interests to Lehey, who currently owns 68.04% of the membership interests in FSJ. (D-11, ¶¶ 30-31)

Various claims were made against the defendants in the New York Litigation including those based on breach of contract, fraud, conversion, breach of fiduciary duty and unjust enrichment. (D-11) Lehey alleged that his investment was based on his understanding that FSJ would develop and patent the billboard on a bottle technology and that FSJ would own all of the intellectual property. (*Id*.) Lehey further alleged that he understood that FSJ would produce and own all of the MEDEA vodka inventory. (*Id*.) Lehey also claimed that Goldburt and Sandy misused the FSJ assets by making loans totaling $3,867,000 to RAM, which purportedly agreed to repay the loans by giving the technology and intellectual property it developed to FSJ. Lehey claimed that his consent was never sought or obtained for this loan. Lehey asserted that no promissory notes or loan agreements were executed to support the $3,867,000 loan to RAM. (*Id*.) Lehey additionally claimed he was not informed of the creation of Imports and did not consent to FSJ loaning Imports over $900,000 to purchase the vodka inventory. (*Id*.) As with RAM, Lehey alleged that no promissory notes or loan agreements exist to evidence the loan to

4

Imports. (*Id*.) Lehey alleged that this conduct was also contrary to his understanding that FSJ would produce and own the MEDEA vodka. (*Id*.)

On June 2, 2011, on Lehey's request for a provisional remedy, Justice Ramos entered an order, that among other things designated and installed Lehey as manager of FSJ; removed Goldburt as manager; and directed the defendants not to transfer any of the FSJ property, assets, inventory or funds, except as required in the ordinary course of business. (D-8) Defendants appealed this order to the Appellate Division, First Department. By order dated December 1, 2011 the Appellate Division vacated that portion of the order that removed Goldburt and installed Lehey as manager and remanded the matter to Justice Ramos "for a hearing on whether FSJ's assets are at risk of being materially injured or destroyed or whether plaintiff will be irreparably harmed in the absence of a provisional remedy, and to determine the appropriate provisional remedy if any…." (*Id*.)

While the above appeal was pending in the Appellate Division, it appears that discovery continued in the matter below. During a September 16, 2011 deposition Goldburt revealed for the first time that Matt Sandy was his son. (D-9 90:22-91:2) This revelation was preceded by testimony from Goldburt that he first met Sandy several years ago when he was looking for someone to help him with a business development, and that Sandy was introduced to him by someone whose name Goldburt was not able to recall. (*Id*., 87:12-88:12)

In part based on this newly discovered information, Lehey's counsel moved by order to show cause to prohibit Sandy, Goldburt and RAM from voting at a Special Meeting of the Members of FSJ called by Lehey. (L-4) Justice Ramos combined the hearing on this motion with the hearing required by the remand order from the Appellate Division, which hearings commenced on March 29, 2012. (L-5) At the conclusion of argument Justice Ramos directed

5

that the Special Meeting of the Members would be adjourned until conclusion of the hearings, which would recommence with testimony on Monday, April 2, 2012. (L-5 18:8-26) The court made very clear its intent to complete the evidentiary hearing required by the Appellate Division as a predicate for granting a provisional ruling. Justice Ramos concluded the hearing with the following remarks:

> THE COURT: I'm not fooling around with the case. Somebody has seven and a half million dollars invested and they have nothing to show for it. If he's right, he's going to win; and if he's wrong, he's going to lose.
>
> Mr. Smith: Right.
>
> The Court: This case has been kicking around since 2010 and it is now 2012.
>
> Mr. Smith: Right. And the plaintiff –
>
> The Court: See you Monday Afternoon. Thank you very much.
>
> Mr. Epstein: Thank you.
>
> Mr. Smith: Thank you.
>
> The Court: And tell your client that by the end of next week this case will be over, at least as far as this hearing is concerned, this hearing, and you better get someone in here and testify if they want to testify.
>
> Mr. Smith: We'll let them know.
>
> The Court: Okay.

(L-5 20:19-21:11)

Testimony of Goldburt was given on April 2, 2012 and substantial testimony of Lehey was heard on April 3, 2012. (L-6) The proceedings recommenced on April 4, 2012 with discussion regarding settlement terms, which ultimately did not prove fruitful. As a result, testimony from Sandy was commenced. At the end of the day Justice Ramos announced that testimony would recommence on April 5, 2012 at 2:00 and that "[o]ne more hour and we are

done with defendant's case." (L-6 224:11-12)  On April 5, 2012, instead of resuming testimony, both counsel presented Justice Ramos with an interim resolution that was intended to provide a platform for final settlement terms.  As part of the process they requested (and the court agreed) that the court "so order" a freeze on the disposition or use of the MEDEA vodka inventory (L-6 226:12-17), and a freeze on funds in the FSJ and Imports bank accounts.  (L-6 227:6-8)  The parties further agreed that the court-ordered freeze would remain in effect until April 19th when the parties returned to court for a conference. (L-6 229:22-24)  New hearing dates of May 14-16, 2012 were also agreed upon by the parties in the event final terms of settlement could not be reached. (L-6 230:3-5)

It appears that no final settlement was reached.  On April 19, 2012 the parties stipulated to continuing the freeze until May 14, 2012, except that on or after May 4, 2012 on one-day notice either party could seek to vacate the previously ordered freeze.  (L-7)  The May 14th date referenced in the stipulation may be incorrect as both counsel and the court at the May 7, 2012 hearings stated that the stay expired on May 7, 2012.  (L-8)  Counsel for Lehey requested that the stay be continued until May 14th when the evidentiary hearing was scheduled to resume.  (L-8 2:9-13)  After a spirited discussion among counsel and Justice Ramos, the court stayed all use of funds and suggested that the defendants apply to the Appellate Division for a clarification of the scope of its order that left in place the injunctive relief preventing the transfer of FSJ's property, assets, inventory or funds, except as required in the ordinary course of business.  (L-8 10:22-13:16)  On May 11, 2012 Imports and FSJ filed Chapter 11 petitions in the District of New Jersey just three days before the evidentiary hearing was to resume before Justice Ramos.[2]

---

[2] This court has also been informed that the Debtors have sought to remove the New York Litigation to this court.

### B.    The Chapter 11 Cases

The petitions reveal very few non-insider claims. FSJ lists thirteen unsecured creditors with claims totaling $2,249,076.10. However, when the insider claims of Sandy, Goldburt, and Goldburt's companies, General Phosphorix, LLC and General Sensing Systems, are subtracted, FSJ has but nine unsecured creditors with claims approximating $312,000. Imports likewise scheduled few unsecured creditors. It lists nine creditors holding unsecured claims totaling $45,926.58, and a priority unsecured wage claim in the amount of $7,528.29. No tax claims are identified, but both FSJ and Imports identify Gateway Warehouse ("Gateway") as a secured creditor of their respective bankruptcy estates holding a claim of $381,521.65 secured by collateral valued at $4.5 million.[3] Imports further identifies a landlord's rent claim of $8,015.62 as a secured claim. Based on the Debtors' schedules, at most, the combined non-insider unsecured debt of the FSJ and Imports amounts to approximately $365,454 and the combined secured debt approximates $389,537.

In his testimony before this court Sandy testified that FSJ and Imports filed Chapter 11 cases because of mounting debt, declining cash flows, problems with the LED component manufacturing, the cost and distraction of the New York Litigation and cash that didn't come in from anticipated sources. (6/8/12 Hrg, Tr. 104:9-16) These statements are in direct contradiction to statements made by Sandy and Goldburt in affidavits filed in the New York Litigation dated February 28, 2012 – less than ninety days before the Chapter 11 cases were filed. In his affidavit Sandy unequivocally stated:

---

[3] Though FSJ and Imports failed to describe on Schedule D the property subject to Gateway's lien, the court presumes it to be the MEDEA vodka inventory, valued at cost as described in the Sandy Certification. (Sandy Cert. ¶ 29) Subsequently, in testimony before this court on June 8, 2012 Sandy revised his estimate of the value of the MEDEA vodka inventory to $3.3 million, but also agreed that the FSJ intellectual property has a value of approximately 2.6 million, creating an asset base for the Debtors of approximately $6.0 million (6/8/12 Hrg. Tr. 172:12-21)

8

> I understand that Lehey has alleged that FSJ is insolvent. This allegation is false. FSJ has assets which exceed its liabilities and is able to pay all of its obligations as they become due.

(L-2; 2/28/12 Matt Sandy Affidavit ("Sandy Aff.") ¶ 76)  Sandy further elaborated that:

> Although Lehey's failure to complete his investment obligation caused a temporary cash flow crisis for FSJ which caused FSJ Imports to fall temporarily in arrears on the warehouse fees charged by Gateway Warehouse to house the inventory, those issues have been resolved with Gateway, and FSJ and FSJ Imports have negotiated a payment plan that will permit FSJ Imports to pay the arrears from the proceeds of future sales of MEDEA Vodka. Gateway Warehouse has confirmed to me that it does not intend to exercise any warehouseman's lien on the inventory (which in any event would cover only a small portion of the inventory) or to interfere in any with FSJ Imports' removal of inventory from the warehouse to cover current sales.

(*Id.*, ¶ 94)

Goldburt similarly stated in his February 28, 2012 affidavit that:

FSJ is not insolvent. It has a small amount of working capital, its assets exceed its liabilities, and it is able to pay its bills as they become due from the proceeds of sales of MEDEA Vodka.

(L-2; 2/28/12 Tim Goldburt Affidavit ("Goldburt Aff.") ¶ 100)  He further explained:

> I understand that Lehey and his counsel have argued that FSJ Imports is in arrears on its payments to the distiller in Holland that formulated MEDEA Vodka and filled the bottles comprising the current inventory.
> Although it is true that Lehey's failure to complete his investment caused FSJ Imports to delay payment of amounts owed to the distiller, FSJ Imports has made additional payment to the distiller from the proceeds of sales of MEDEA Vodka, and is currently on good terms with the distiller. (*See* letter from distiller dated April 29, 2011, a true and correct copy of which is annexed hereto as Exhibit 32).

(*Id.*, ¶¶ 92 and 93)(attached letter from distiller omitted)

Before this court, Sandy attempted to retract the statements in his affidavit that the business was solvent. On direct examination by his counsel Sandy testified as follows:

9

> Q: Okay. Did there come a point in February of this year, about 90 days ago, when you executed a certification with regard to the state court matter?
>
> A. Yes.
>
> Q. Okay. And did you in that certification indicate – strike that. Explain to the Court what you indicate in that certification as to what your testimony was at that time.
>
> A. My testimony at the time was that we could pay bills as they become due and the company is solvent.
>
> Q. Okay. And paying debts as they became due in February of this year was based on what analysis?
>
> A. It was based upon – at the time we had a credit line so we were able to utilize that source of funds to pay the bills. It didn't take into account that accruing historical debts of the company.
>
> Q. When you say it did not take – and why was that? And when you say accruing historical, are we talking about the distiller and Gateway?
>
> A. Correct.
>
> Q. And some of the other debts?
>
> A. Yeah.
>
> Q. So why did you not take that into account when you certified to the state court?
>
> A. Because I was referring to the ongoing concern in terms of maintaining operations and at the time we thought that we would be able to capitalize and inject the company with funds necessary to resolve all the debts.

(6/8/12 Hrg. Tr. 116:13 to 117:14)

The foregoing testimony before this court is completely contradictory to the sworn statements of Sandy and Goldburt in their affidavits. As a result. Sandy's testimony in particular, is not credible to this court. In fact, as recited in the affidavits the debts owed to the

vodka distiller and Gateway were not only considered by Sandy, but both Sandy and Goldburt explained that neither creditor was pressing for full payment. This court finds that the contradictory testimony by Sandy makes his testimony unreliable and no weight will be given to his testimony about the solvency of Imports and FSJ.

On June 4, 2012 FSJ and Imports filed a Joint Plan of Reorganization and Disclosure Statement. The filing of these documents has only some bearing on the present hearing. But the court does find that they provide some further indication that these cases were filed for a tactical litigation advantage. As stated at page 20 of the Plan of Reorganization:

> The plan will be funded by the Debtors' cash on hand at the Effective Date and income thereafter. In addition, Tim Goldburt ("Goldburt"), shall infuse $1,000,000 as new value and obtain forty percent (40%) of the Reorganized Debtors' ownership interest. Pre-petition equity in FSJ shall be reduced to sixty (60%) percent ownership in the Reorganized Debtors.

(Plan of Reorganization § D.1) This section evidences the reality that the purpose of the Chapter 11 cases was to remove FSJ and Imports from the jurisdiction of the Supreme Court of the State of New York, New York County and to continue Goldburt's control. Goldburt acknowledged under cross-examination that he could infuse $1 million into the companies and pay the creditors, but stated that he was unwilling to do so outside of the proposed plan because it was the best way to achieve reorganization of the case. He further stated that he is the person to steer the company to success – that he has in his mind the technological road for the company. (6/18/12 Hrg. Tr. 197:12-198:6)

## DISCUSSION

A Chapter 11 petition is subject to dismissal unless it is filed in good faith. *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999). Once it is put at issue, the debtor has the

burden of establishing good faith. *Id*. at 162 n. 10. At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purpose of bankruptcy. *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004). In *Integrated* the court identified two inquiries that it described as integral to the determination of whether a petition is filed in good faith: (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed to obtain a tactical litigation advantage. *Id*. at 119-20. As set forth below the court finds that the Chapter 11 cases do not serve a valid reorganization purpose, and that the petitions were filed simply to obtain a tactical advantage in the New York Litigation. As a result, both cases are dismissed.[4]

### A. Lack of Valid Bankruptcy Purpose

Neither FSJ nor Imports has many creditors, and the few that exist are not making demands on the Debtors. As indicated above, the two creditors holding the most significant claims reached payment terms with Imports and FSJ prior to the Chapter 11 petitions. No creditors were demanding payments when the petitions were filed. As a result, the court cannot find any indication that either Debtor is generally not paying its debts as they come due. Even more clearly, the court cannot find that their liabilities exceed their assets, because the combined companies are actually asset rich.[5] The combined value of the MEDEA vodka inventory and intellectual property ranges between $5.9 million to $7.1 million. The claims of non-insider

---

[4] Because the court dismisses these cases on the basis of a lack of good faith it does not reach Lehey's alternative argument that the filing of the FSJ petition was not properly authorized.
[5] The court treats Imports and FSJ as a combined entity for purposes of determining the existence of a valid reorganization purpose because that is the treatment proposed in their Joint Plan of Reorganization.

12

unsecured creditors amount to approximately $365,454, and the claims of secured creditors approximate $389,537, for a total non-insider creditor body of less than $1 million. In making its determination that Imports and FSJ are asset rich the court has also considered that at least one equity member of FSJ, Tim Goldburt, has $1 million from which he could satisfy all creditor claims.

Thus, the lack of financial need for bankruptcy protection in a case of this size and type is as glaring as that found by the Third Circuit in *SGL* and *Integrated*. In *SGL* the court found that the company was financially healthy and the distraction of pending litigation did not pose a serious threat to its operational well-being. 200 F.3d at 166. The court distinguished the effect of the pending litigation in *SGL* from that faced by the debtors in *In re Johns-Manville*, 36 B.R. 727 (Bankr. S.D.N.Y. 1984), *In re Cohoes Indus. Terminal, Inc.,* 931 F.2d 222 (2d Cir. 1991) and *In re The Bible Speaks*, 65 B.R. 415 (Bankr. D. Mass. 1986). *Id*. at 164. Arguably, depending on whether the New York Litigation becomes protracted the Debtors may have a future need to file. But, as noted in *SGL*, "[t]he mere possibility of a future need to file does not establish that a petition was filed in 'good faith.'" *Id*.

Fairly read, *SGL* holds that faced with litigation an entity need not wait until judgment before filing, but that the financial/operational impairment must at least be in prospect. Similarly, in *Integrated* Judge Smith made the point that:

> Integrated had $105.4 million in cash and $1.5 million in other assets at the time that it filed for bankruptcy, and yet the Landlord's proof of claim lists the present discounted value of Integrated's lease obligations at approximately $26 million. Integrated's schedules also list miscellaneous liabilities of approximately $430,000. Thus Integrated was highly solvent and cash rich at the time of the bankruptcy filing.

384 F.3d at 112. In the instant matter, not only are the debtors asset rich, but the pending litigation is not even creditor driven. Rather, it is a struggle for control between two members of

13

a limited liability company. It is for this reason that the court finds significant Goldburt's ability to infuse $1 million to satisfy creditor claims. There is of course no obligation that he invest the funds outside of a plan of reorganization, but the availability of those funds in addition to the assets of Imports and FSJ makes it suspect that the Chapter 11 petitions were prompted by a need for financial restructuring.

### B.    Tactical Litigation Advantage

The court has read the hearing transcripts from the New York Litigation that have been submitted into evidence sub judice. From these transcripts it is plain that Justice Ramos was conducting an evidentiary hearing in order to determine whether Lehey was entitled to a provisional remedy -- perhaps Lehey replacing Goldburt, appointment of a receiver or some other provisional remedy. Also scheduled was Lehey's motion to bar Sandy and RAM Phosphorix from voting at the Special Meeting of Members called to remove Goldburt as the managing member. Plainly, an adverse decision by Justice Ramos on either matter would cause Goldburt to lose managerial control, and it is reasonable to infer that the filing of these cases on May 11, 2012 (three days before hearings were to resume before Justice Ramos) was prompted by the concern that Goldburt and Sandy would lose control of Imports and FSJ. In light of the lack of financial necessity, and pending New York Litigation, this court concludes that the cases were filed to gain a tactical litigation advantage. Further evidence of this intent is demonstrated by the funding provision contained in the Joint Plan of Reorganization. The practical effect of granting a 40% membership interest to Goldburt in exchange for his investment is to dilute Lehey's membership, thereby effectively eliminating Lehey's ability to challenge Goldburt's management.

Also telling, is that notwithstanding Lehey's 68% membership interest in FSJ he was not consulted about the Imports and FSJ bankruptcy petitions. Now, the court recognizes that Lehey and Goldburt were engaged in litigation over control of FSJ and Imports, and the parties appear to have been antagonistic, but at the time these cases were filed there was a break in the litigation because the parties were engaged in settlement discussions. If in fact the companies were in financial distress such that there was a need for financial reorganization in bankruptcy, that could have easily been part of the settlement discussions among Goldburt, Sandy and Lehey as equity members. In short, considering the totality of circumstances the court finds that the purpose of these Chapter 11 cases was to gain a tactical litigation advantage.

## **CONCLUSION**

Based on the prepetition history and the postpetition conduct, ample evidence exists that the Chapter 11 petitions of Imports and FSJ were not filed in good faith, and the cases are dismissed under 11 U.S.C. § 1112(b).

Dated: July 23, 2012 ____/S/_____
NOVALYN L. WINFIELD
United States Bankruptcy Judge

15